**Volney F. TUTTLE, Respondent,**

v.

**Pasquale TOMASINO, Appellant.**

**No. 47378.**

Supreme Court of Missouri,
Division No. 2.
June 13, 1960.

Allen, Woolsey & Fisher, Springfield, for appellant.

Neale, Newman, Bradshaw, Freeman & Neale, F. B. Freeman, Donald J. Hoy, Springfield, for respondent.

STORCKMAN, Judge.

The action is to recover for personal injuries received by the plaintiff when struck by an automobile operated by the defendant. Plaintiff's petition prays for damages in the amount of $50,000. The verdict and judgment was for the defendant, but the trial court granted a new trial on plaintiff's motion and the defendant has appealed. The issues on appeal are whether the trial court erred in giving an instruction on contributory negligence requested by the defendant and in excluding from evidence a deposition offered by the plaintiff on the ground that it was not signed by the witness.

The mishap occurred on December 18, 1954, at about 3:25 a. m. on U. S. Highway 66 about ten miles east of Springfield, Missouri. The plaintiff was a serviceman stationed at Fort Sill, Oklahoma, as were most of the others connected with the occurrence. The plaintiff, George Trout and Carol Trout, his wife, and Billy Welch, were enroute from Fort Sill to their homes in Indiana to spend their Christmas leaves. They left Fort Sill shortly after 6 p. m. the evening before and were riding in a 1951 Ford automobile owned by George Trout. They ran into a snow storm and when they reached Springfield there was snow and ice on the highway. The snow continued falling, coming from the west and northwest, and was sticking to vertical objects, such as highway signs.

The plaintiff took over the driving of the Ford at Springfield and proceeded east on Highway No. 66. He drove at approximately 40 miles per hour and was following a Mercury automobile driven by Delbert Edens. Near the place in question, Highway 66 became a divided highway separating into eastbound and westbound lanes. The place where it divided was generally referred to in evidence as the split, and we shall continue to do so. The eastbound lane took off at a rather sharp angle to the right of eastbound travelers and the westbound lane was on a straight line with the pavement west of the split. At and near the split, highway directional and warning signs were covered with snow and unreadable. As a result, Edens, driving the Mercury, continued straight ahead at the split and into the westbound lane of Highway 66, and the plaintiff making the same mistake followed him. After the Mercury had passed the split, its brake lights came on and the plaintiff applied the brakes on the Ford but was unable to stop. The Ford slid on the slick surface and its right front portion struck the left rear of the car ahead. The Mercury came to rest off the south side of the highway headed south in a ditch or depressed area between the two lanes of the divided highway with its rear wheels on or near the shoulder. The Ford automobile spun around and stopped across the traveled portion of the highway headed slightly northwest with its front wheels north of the center and its rear end near the south edge of the pavement. Its right front headlight was extinguished by the impact. The Ford was about 25 or 30 feet west of the Mercury and there was a distance of 10 or 12 feet between them from north to south. The collision occurred about 300 feet east of the split. The highway was straight and level; the concrete pavement was 24 feet in width and the shoulders were about 12 feet wide.

No one was seriously injured as a result of this collision, and all occupants got out of the two automobiles. A westbound

truck stopped and, on ascertaining there were no serious injuries, the driver stated he would report the accident and proceeded passing to the north of the Ford. The plaintiff testified that no effort was made to move the Ford automobile; the evidence does not show if it was disabled. About ten minutes after the orginal occurrence, the plaintiff went to the Ford automobile where it stood on the highway to get his coat and hat out of the car. He stood on the east side of the Ford near the center of the highway as he opened the automobile door. Looking over the top of the Ford, he saw headlights of an automobile approaching from the west which later proved to be those of the defendant's car. When he first saw the lights, they were west of the junction and he wasn't particularly concerned. He reached into the automobile, obtained his coat and put it on before he again looked over the top of the car and saw the lights east of the split. The oncoming automobile was on the south or the correct side for a two-way highway and, thinking that defendant's automobile was going to hit the back part of the Ford car, the plaintiff started to run to the south. Out of "the corner of his eye" he saw that the defendant's automobile was also veering to the south. He had taken about three steps and was just off or about to go off of the shoulder when defendant's automobile struck him. The defendant's car then collided with the Mercury and stopped. The plaintiff was found on the ground beneath the defendant's automobile, but the evidence does not show what part of the car struck him.

The plaintiff testified that George and Carol Trout, and perhaps others, were standing on the shoulder of the highway, somewhere between the Mercury and Ford automobiles. When he started to run, he called a warning to them thinking that the defendant's car would hit the Ford, push it against the Mercury and injure someone. The plaintiff also testified that Billy Welch was standing near the north end of the Ford with a flashlight.

A highway patrolman, who arrived at the scene of the accident about twenty minutes after the plaintiff was injured, testified on direct examination by the plaintiff that his investigation at the scene disclosed that the defendant had three alternatives: (1) hitting the Ford, (2) going into the ditch, or (3) hitting people standing between the two cars.

The defendant, also a soldier from Fort Sill on his way home, was driving his own car, a 1947 Cadillac. He was accompanied by two other soldiers and two sailors they had picked up. The defendant also passed the eastbound turnoff as the others had done before him and entered the westbound highway. He saw the single headlight of the Ford when he was about 75 to 100 feet from it. The headlight was on the north side of the pavement but was "a little ajog"; he could not tell if the car was moving. When he got within 50 feet of it, he saw the automobile itself across the highway at an angle pointing northwest. When he first saw the headlight he was going about 35 to 40 miles per hour and took his foot off of the accelerator. When he saw the side of the Ford in his path, he was going 30 to 35 miles per hour and started to apply his brakes. Thinking that he would skid, he undertook to go around the Ford on the south but saw a Plymouth automobile in that space, half on and half off the road, so he turned toward the ditch. He then saw several people standing near the Mercury. They started running both north and south and he ran into the Mercury in an effort to avoid hitting any of the people. He was not aware that his automobile had struck the plaintiff until the people gathered around his automobile. The defendant had his headlights on low beam because in snow or fog the high beam throws a glare, and in the conditions existing a person can see better with a low beam. This gave him visibility of about 75 to 100 feet ahead of him on the highway. He did not see any light other than the single headlight.

Apart from medical witnesses, the only ones to testify in plaintiff's case were the plaintiff and the highway patrolman. In defendant's case, the defendant and one of the occupants of his automobile testified. The case was tried almost four years after the accident and it appears that some of the witnesses could not be located. However, there was very little conflict in the testimony on the material issues.

The jury first undertook to return a verdict in this form: "It is the finding of this jury that this accident was unavoidable." On being advised by the court that they would have to find for one party or the other, the jury again retired and returned its verdict for the defendant and judgment was entered accordingly on September 9, 1958.

On September 18, 1958, the plaintiff filed his motion for new trial in which he alleged, inter alia, that the court erred in refusing to admit in evidence the deposition of Billy Welch taken in Lexington, Kentucky, on July 25, 1958. No affidavits were filed at that time in support of the motion, but it was asserted that the court reporter who took and transcribed the deposition inadvertently and mistakenly failed to include in the deposition a stipulation waiving the signature of the witness, that the plaintiff was surprised at the trial by the defendant's objection and that such mistake and surprise were grounds for a new trial within the meaning of S.Ct. Rule 3.22, now Rule 78.01, V.A.M.R.

The motion for new trial was argued and submitted on November 21, 1958, and was sustained on December 11, 1958, without specification of grounds. Notice of appeal was filed on December 19, 1958. Thereafter, on May 8, 1959, the plaintiff filed a motion for nunc pro tunc orders which motion was sustained on May 18, 1959. The court found that plaintiff's counsel had filed in open court on November 21, 1958, at the time the motion for new trial was argued, an affidavit by Billy Welch and one by the shorthand reporter who

took and transcribed the deposition; that the affidavits were placed in the court files but, due to inadvertence of the court and counsel, were never stamped as filed by the clerk and no entry of their filing was made. The court ordered that an entry be made in the docket sheets of the court and clerk showing that the affidavits were filed on November 21, 1958. Welch's affidavit stated in substance his recollection was that he was asked before the deposition started if he would waive signing the deposition and he said he would. In her affidavit the reporter stated that plaintiff's counsel and the Lexington lawyer representing the defendant at the deposition hearing agreed the signature of the witness would be waived; that neither dictated a stipulation but she remembered the waiver by counsel and for that reason she did not procure the signature of the witness. The court also ordered a nunc pro tunc entry to show the grounds upon which the new trial was granted, but this need not be noticed further because the defendant makes no complaint as to that phase of the orders. Nor need we determine if there was any proper basis for the nunc pro tunc entries with regard to filing of the affidavits since they were not timely served or filed even as of November 21, 1958, and were not properly before the trial court or this court on review.

■ Section 510.350 RSMo 1949, V.A.M.S., and now S.Ct. Rule 78.03 provide that when a motion for new trial is based upon affidavits, they shall be *served* with the motion. On the contention most favorable to the plaintiff, the affidavits were not offered for filing until more than sixty days after the motion for new trial was filed. Plaintiff concedes that "this procedure was not in strict accord with the statute" but asserts that since the defendant did not object "in the record" at the time the motion for new trial was argued and did not ask leave to file counter affidavits, he is in no position to complain on appeal. Thorn v. Cross, Mo.App., 201 S.W.2d 492, 496, cited in support of this contention, is of no

help to the plaintiff. In that case affidavits were filed with the motion for new trial. There is no showing in the present record that the affidavits were served on the defendant at any time. Section 510.350 further provides that the opposing party has ten days "after such service" to serve opposing affidavits which time the court may extend for "an additional period not exceeding twenty days."

Finding nothing in the record to relieve against the positive requirements of the statute, the affidavits cannot be considered, and the admissibility of the deposition must be determined on the record made at the trial.

The deposition of the witness Welch was filed in this court as a part of the transcript by stipulation of the parties. The plaintiff contends it contains vital testimony on the issue of whether any warning was given the defendant. In our view Welch's testimony has little or no value on the issue of an adequate warning to eastbound travelers. Among other things, Welch testified that he got a flashlight and stood north of the Ford automobile and that the driver of an eastbound car, such as the defendant's, would have to look through the light created by the remaining headlight burning on the Ford car which was shining in a northwesterly direction. The defendant admitted he saw the single headlight on the Ford which was a little askew, but it does not appear that he could or should have seen a flashlight on the north side of the road behind or to the east of this headlight, or that he could have seen it any sooner than he saw the headlight. This position may have had some value in warning westbound traffic, but a more effective place for warning eastbound motorists would have been on the south side of the pavement and a sufficient distance west of the highway obstruction to enable the driver to stop or slow his automobile.

The deposition taken in Lexington, Kentucky, had been filed in the circuit court and remained sealed until after the plaintiff had testified. Plaintiff's counsel then asked and obtained the court's permission to open the deposition. This appears to be the first occasion on which either the plaintiff's or defendant's counsel had seen the completed deposition. The following then occurred in the chambers of the court out of the hearing of the jury:

"Mr. Clark: The defendant objects to the admission of the deposition of Billy Lee Welch, or any part of it into evidence, on the ground that the deposition has not been signed by the deponent, and there is no showing that there was any waiver, or agreement of waiver, of the signature by these parties.

"Mr. Freeman: This is the first time I have looked at it. It appears that it hasn't been signed. Maybe I am mistaken; maybe the reporter left it out; I don't know. I thought that the subject was discussed, and that we agreed to waive it,—or that it was to be signed, I don't remember, which.

"Mr. Clark: I wasn't present.

"Mr. Freeman: No, you boys weren't present.—I can't say, Your Honor; I don't really remember. I know we took it by agreement, without any notice being served, and I know when we got down there, we talked about the signature, and I started to dictate something, and I remember they said they had the usual form they put on here. And I see it does not say anything about waiver of signature, and I see the witness did not sign it; I will say that is true. I suppose, if these men want to object to the offer of it, under those circumstances, that there isn't anything I can do about it, because I can't get the lawyer who participated in it, and I can't get the witness up here.

"Those are what the facts are. The best that I remember, I thought we had an understanding; maybe we didn't.

"Mr. Fisher: With us? Did you think you had one—an understanding with us?

"Mr. Freeman: I don't know, Haroid; I don't know, don't know whether we did

or not. Certainly, we wouldn't have gone clear down and taken it,—

"Mr. Fisher: —You think you had some understanding with me?

"Mr. Freeman: I don't remember,—

"Mr. Fisher: —No, nothing was ever mentioned to me; you said you wanted to take a deposition,—

"Mr. Freeman: —But I don't remember about the other,—

"Mr. Fisher: —No mention of signature.

"Mr. Freeman: But of course, as I say, I sure as the devil wouldn't have gone down there and taken it, without having an understanding from that lawyer, or somebody, or else having the signature, and that is my understanding,—but you are exactly right; it is not signed, and the record does not show that there was any waiver.

"The Court: Well, I guess it wouldn't be admissible, then.

"Mr. Freeman: Okay."

Section 492.340 RSMo 1949, V.A.M.S., and now S.Ct. Rule 57.22 require that the deposition shall be signed by the witness "unless the parties by stipulation waive the signing * * *. If the deposition is not signed by the witness, the officer shall sign it and state on the record the fact of the waiver * * *." The deposition is not signed by the witness nor did the officer state on the record the fact of the waiver.

■ In its preamble the deposition states: "The deposition of Billy Lee Welch was taken by agreement of the parties, on Friday, July 25, 1958, at the hour of 2:00 p. m., Central Daylight Time, at the offices of Stoll, Keenon & Park, First National Bank Building, Lexington, Kentucky, said deposition to be read as evidence on behalf of the plaintiff on the trial of the above-styled action." Plaintiff now contends this amounts to a stipulation to permit the deposition to be read in evidence without the signature of the witness, but we cannot so construe the stipulation. It appears to be nothing more than an agreement of dispensing notice as to the time and place of the taking of the deposition and does not purport to be a waiver of signature.

■ In his motion for new trial, the plaintiff claims that a waiver of the signature of the witness was not entered in the deposition through mistake of the reporter and that he was surprised by the defendant's objection at the trial. He claims relief under S.Ct. Rule 3.22, now Rule 78.01. As shown by the above excerpt from the transcript no issue of surprise or mistake was presented to the court at the trial; no affidavit of surprise was filed or offered and no delay was requested to get either the signature of the witness or a statement of waiver by the reporter. Such a claim of surprise or mistake raised for the first time in the motion for new trial comes too late. Helton v. Huckeba, 365 Mo. 93, 276 S.W.2d 78, 85[9]; Silvey v. Herndon, Mo.App., 234 S.W.2d 335, 339–340[5, 6].

■ The plaintiff further contends that a witness' signature to his deposition is an informality which must be raised by a motion to suppress before going to trial and is waived if made for the first time at the trial. He cites such cases as Holman v. Bachus, 73 Mo. 49, 51–52, and Hoyberg v. Henske, 153 Mo. 63, 55 S.W. 83, 85–86. This subject matter is now dealt with in our new Rules of Civil Procedure and particularly Rule 57.48(d) which provides: "Errors and irregularities in the manner in which the testimony is transcribed or the deposition is prepared, signed, certified, sealed, indorsed, transmitted, filed, or otherwise dealt with by the officer under Rule 57 are waived unless a motion to suppress the deposition or some part thereof is made with reasonable promptness after such defect is, or with due diligence might have been, ascertained." The Committee Note to this rule states: "This is Rule 32, Federal Rules of Civil Procedure. It is substantially in accord with Missouri law as announced in judicial decisions." The court rule 57.48(d) fairly states the case law deducible from the decisions cited by the plaintiff.

There is no showing in the record that either the defendant's attorneys in Springfield or the Lexington attorney who attended the taking of the deposition had any knowledge that the deposition had not been signed by the witness prior to the time it was opened at the trial of the case. Nor can we say that the exercise of due diligence required the defendant to take steps to open the deposition and inspect it before trial. Rather the duty to see that it was in order was upon the plaintiff because it was a part of his case. There is nothing in the record to support a finding of lack of diligence on defendant's part and, therefore, no basis for holding that the defendant's objection was not available to him at the trial. The trial court correctly ruled in excluding the deposition and was in error in granting a new trial on this ground. Byers Bros. Real Estate & Insurance Agency, Inc. v. Campbell, Mo.App., 329 S.W.2d 393, 397–398 [9]; Westinghouse Electric Supply Co. v. Binger, Mo.App., 230 S.W.2d 166, 168[2, 3]; Zweifler v. Sleco Laces, Inc., D.C., 11 F.R.D. 202, 203[3]; Mortensen v. Honduras Shipping Co., D.C., 18 F.R.D. 510, 511[2]; Porter v. Seas Shipping Company, Inc., D. C., 20 F.R.D. 108, 109[2, 3].

Defendant's Instruction No. 8 on contributory negligence instructed the jury in substance that if they found that the Ford automobile operated by the plaintiff collided with the rear of the Mercury automobile due to the negligence of the plaintiff in failing to keep a proper and vigilant lookout or in failing to have his vehicle under control " * * * and if you further find that following the collision between the vehicles operated by the plaintiff, Volney Tuttle, and the said Delbert Edens, that the vehicle being operated by the plaintiff, Volney Tuttle, was caused or permitted to come to rest on U. S. Highway 66 and obstructed the traveled portion thereof, if you so find, and if you further find that such negligence, if any, of the plaintiff, Volney Tuttle, caused or contributed to cause the accident between the vehicle being operated by the defendant, Pasquale Tomasino and this plaintiff, Volney Tuttle, if so, and the plaintiff's injuries and damages, if any, then plaintiff, Volney Tuttle, is not entitled to recover against the defendant, Pasquale Tomasino, even though you find that defendant Pasquale Tomasino was negligent as submitted to you in other instructions, and your verdict should be against the plaintiff, Volney Tuttle, and in favor of the defendant, Pasquale Tomasino."

Plaintiff contends that the instruction improperly and erroneously declares the law of negligence. Plaintiff concedes that as driver of the Trout car he "owed a duty to all persons on or about the highway to keep a vigilant lookout and to keep his vehicle under control" and that after the first accident he "owed all approaching motorists the duty of removing the vehicle he had been driving from the traveled portion of the road as soon as he possibly could". He asserts, however, that he owed no duty to the defendant until "plaintiff's vehicle came to rest and obstructed the traveled portion of the road" and that the instruction "rules out any possible negligence on the part of the plaintiff in permitting the vehicle to remain on the highway." He concludes that the instruction is "erroneous in that it permitted defendant to rely on a breach of duty owed by the plaintiff to the" other occupants of the Trout and Edens automobiles. The essence of plaintiff's complaint seems to be that the only negligence with which he could be charged by the defendant was in permitting the Ford automobile to remain on the highway and that such issue was not submitted by the instruction or at least not properly submitted. Plaintiff speaks throughout his brief of his duty to the defendant as if the defendant were the claimant, but recognizes in a footnote that such duty "would also be a breach of duty toward plaintiff himself in the exercise of ordinary care for his own safety."

In effect the plaintiff disclaims any responsibility for the *creation* of the hazard although it resulted from negligent acts or omissions on his part. It may well be

that the plaintiff could have been charged with contributory negligence in failing to remove the obstruction from the highway if the evidence had shown that this could have reasonably been done in the ten-minute interval between the first and second mishaps. And perhaps he could have been charged with subsequent acts of negligence in returning to the Ford car and remaining there the length of time necessary to get his coat and put it on when by his own testimony he saw the lights of the defendant's automobile approaching from the west and knew or should have known that the defendant was likely to make the same mistake the plaintiff and the others had, and finally, that the plaintiff in the exercise of ordinary care could have discovered that the defendant had entered the westbound lane in time for the plaintiff to have retreated to a position of safety. The question presented is whether in these circumstances the defendant is precluded from relying upon the plaintiff's original or primary negligent act or omission in creating the highway obstruction which was hazardous to him as well as others.

■■ If the obstruction of the highway resulted from plaintiff's negligence and the condition thus negligently created continued to exist and contributed to cause his injuries, the defendant is not precluded from relying upon the initial act of contributory negligence even though subsequent negligent acts of the plaintiff also contributed to cause his injuries. Dodson v. Maddox, 359 Mo. 742, 223 S.W.2d 434, 437, 439; Louisville & N. R. Co., v. Beatrice Foods Co., Mo.App., 250 S.W.2d 825, 828 [5]; LeGrand v. U-Drive-It Co., Mo., 247 S.W.2d 706, 711; Dickerson v. St. Louis Public Service Co., 365 Mo., 738, 286 S.W. 2d 820, 824; Gaines v. Property Servicing Co., Mo., 276 S.W.2d 169, 173–174. In the Dodson case, for example, the defendant's gasoline truck was wrecked under circumstances from which the jury might have inferred that the driver negligently drove the truck into an embankment along the roadside. The plaintiff came upon the scene later and was injured when spilled gasoline ignited while he was trying to extricate the driver from the wreckage. The opinion states: "Defendants, however, did owe a duty directly to plaintiff, a duty to exercise ordinary care to avoid injuring him, and that duty existed prior to the time the transport left the highway and collided with the embankment." 223 S.W.2d 437. The court concluded lapse of time between the collision with the embankment and "the subsequent fire and injury was insufficient as a matter of law to show that defendants' negligence had come to rest." 223 S.W.2d 439. The other cases are of similar import. We conclude that the legal theory of the instruction was not erroneous.

■ The plaintiff's remaining contentions are intermingled complaints that: "Instruction No. 8 Is Misleading, Confusing, Omits Essential Elements and Effectually Directs the Jury That Plaintiff Was Negligent on an Unsubmitted Ground." The essential elements alleged to have been omitted are not clearly specified, but the plaintiff indicates that the instruction should have submitted the extent to which the Ford automobile obstructed the highway, contending that the north half of the highway was not obstructed. As we read the record, the evidence shows that the Ford obstructed substantially all of the paved portion of the highway, certainly so far as an eastbound automobile was concerned. Further plaintiff's verdict-directing instruction directed the jury as a matter of law that as the defendant was driving eastwardly "the Ford autombile mentioned in evidence was then standing on the traveled portion of said highway." And by plaintiff's Instruction No. 3: "The court instructs the jury that in determining the issues in this case as submitted to you in other instructions you are to disregard the fact that the portion of U. S. Highway No. 66 referred to in other instructions was designated by the Highway Department of the State of Missouri for the use of westbound traffic only." In these circumstances the instruction could not have been

erroneous for not requiring a more detailed finding.

■ The plaintiff also asserts that the instruction does not require the finding of causal connection between the obstruction of the highway and the second accident in which the plaintiff was injured. The composition of Instruction 8 is not to be recommended, but it does require a finding that the Ford automobile operated by the plaintiff collided with the Mercury automobile because of plaintiff's negligence and came to rest on and obstructed the traveled portion of the highway and that plaintiff's negligence caused or contributed to cause his injuries. The instruction sufficiently required the finding of causation. Knox v. Weathers, 363 Mo. 1167, 257 S.W.2d 912, 915[4].

■ ■ The plaintiff further says that the instruction is confusing and misleading especially because the term "such negligence" could be interpreted by the jury to refer not only to the plaintiff's submitted negligence in the first accident but also as referring to his causing or permitting the highway to be obstructed. As previously indicated, the sentence structure and arrangement of the subject matter of the instruction could be improved upon; but, unless the instruction is in fact misleading, it will not be held erroneous because of its inept composition. Page v. Hamilton, Mo., 329 S.W.2d 758, 764[9]. It should be kept in mind that as to the facts there was little or nothing in this case for the jury to determine. The plaintiff denied there was a Plymouth automobile standing partially on the south shoulder as defendant testified; but plaintiff himself testified there were people standing there between the two cars and there was no showing that the defendant would have avoided striking the plaintiff or others if he had been able to stay on the south shoulder as plaintiff now says he should have done. So far as this instruction was concerned, the substantial issues for determination were plaintiff's negligence and causation. These issues were made clear and we find no basis for holding that the instruction was confusing or misleading to the jury. Dell'Aria v. Bonfa, Mo., 307 S.W.2d 479, 481[3]; Schmidt v. Windish, Mo., 304 S.W.2d 891, 895; Bowzer v. Singer, Mo.App., 231 S.W.2d 309, 313.

We have considered and disposed of all of the claims of error made by the plaintiff and ruled by the trial court and we find no basis for the grant of a new trial. Accordingly, the order sustaining the motion for new trial and granting a new trial is reversed and the cause is remanded with directions to reinstate the verdict of the jury and judgment in favor of the defendant.

LEEDY, P. J., EAGER, J., and BROADDUS, Special Judge, concur.